# AFFIDAVIT

**STATE OF WEST VIRGINIA**
**COUNTY OF KANAWHA, to-wit:**

I, Jonathan Vernon, being first duly sworn, do hereby depose and state as follows:

## INTRODUCTION

1. I am a Task Force Agent with the Drug Enforcement Administration (DEA) and have been since December 2017. I have been employed by the Kanawha County Sheriff's Office for over 18 years. From approximately March 2016 until present, I have been assigned to the Kanawha County Sheriff's Office (KCSO) Sheriff's Tactical Operations Patrol Team (S.T.O.P.) in Kanawha County, West Virginia.

2. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 for a search warrant authorizing the examination of a white cellphone Apple iPhone more fully described in Attachment "A," and the extraction from that property of electronically stored information described in Attachment "B."

3. The contents of Attachment "A," and Attachment "B," to this Affidavit and application for a search warrant are hereby incorporated by reference.

4. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and others.

5. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for this warrant.

## AFFIANT'S TRAINING AND EXPERIENCE

6. I have been a Task Force Agent with the Drug Enforcement Administration (D.E.A) Task Force, of Charleston, West Virginia, from December 2017 to present.

7. As a TFO, I am charged with enforcing the Controlled Substances Act, Title 21, United States Code, et. seq., the West Virginia Uniform Controlled Substance Act and other duties as imposed by law.

8. Prior to being assigned to the D.EA. Task Force, I was assigned to the Kanawha County S.T.O.P. Team, previous to that I was assigned to the Kanawha County Sheriff's Office Road Patrol for over 10 years. During my assignment on the D.E.A. Task Force, S.T.O.P. Team and Road Patrol, I investigate/have investigated street level and higher level drug offenses in uniform and plain clothes capacity.

9. I have received investigative training, conducted and participated in investigations of violations of federal criminal laws, including those related to controlled substances and firearms. These acts commonly involve the criminal use and transfer of illicit drug trafficking and the possession, use and transfer of firearms.

10. In my current position as a DEA Task Force Agent, my primary responsibilities include investigating individuals or groups who have committed violations of narcotics laws and firearms offenses. Within that role, my job duties include, but are not limited to:

   a. Functions as a case agent, which entails the supervision of specific investigations;

   b. Interviewing witnesses relative to the illegal trafficking of drugs and firearms and the distribution of monies and assets derived from these illegal acts;

  c. Functioning as a surveillance agent observing and recording movements of persons trafficking in drugs and firearms and those suspected of trafficking in drugs and firearms;

  d. Drafting, obtaining, and executing search warrants.

## AFFIANT'S KNOWLEDGE OF CELLULAR TELEPHONES AND THEIR USE IN CRIMINAL ACTIVITY

11. I am personally, and professionally, familiar with cellular telephones or mobile telephones.

12. I know that a cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communications between parties.

13. I am aware that cellular telephones usually include a "call log," which records the telephone number, date, and time of calls made to and from the phone.

14. In addition to enabling voice communications, I know that now cellular phones offer a broad ranger of functions, which include, but are not limited to, storing names and phone numbers in electronic address books or contact lists; sending, receiving, and storing text messages and emails; taking, sending, receiving and storing text messages and emails; taking, sending, receiving and storing still photographs and moving videos; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; accessing and downloading information from the internet; and sending, receiving, and storing GPS coordinates of a phone's location.

15. Based on my knowledge, training and experience, and conversations with other law enforcement officers, I know that the cellular phones, such as the Apple iPhone described above, can store electronic information for long periods of time.

16. Based on my knowledge, training and experience, and conversations with other law enforcement officers, I know that it is a common practice for drug traffickers to use and keep cellular telephones in order to facilitate their drug trafficking business. Cellular telephones allow traffickers to remain in close and nearly instantaneous communication with their customers and suppliers.

17. Based on my knowledge, training and experience, and conversations with other law enforcement officers, it is common for cellular telephones used by drug distributors and users to contain evidence of drug trafficking. This evidence includes call logs, text messages, stored emails, contact lists, photographs and video images of drugs, drug proceeds, and drug trafficking paraphernalia and activity, and other information.

18. Based on my knowledge, training and experience, and conversations with other law enforcement officers, it is common for cellular telephones used by drug distributors to contain financial information relating to the proceeds derived from drug trafficking, as well as drug ledgers, banking information and/or information related to laundering money derived from the distribution of illicit drugs.

19. Based on my knowledge, training and experience, and conversations with other law enforcement officers, I know that the electronic memories of cell phones, including social media applications, have been found to contain evidence of illicit firearm possession, including communications regarding when and how illegal guns were obtained, who obtained the illegal guns from the possessor, and motivation for possessing the illegal guns. Further, it is common for those who engage in illegal drug activities to possess firearms to further and facilitate the distribution of controlled substances. Firearms are commonly possessed by drug traffickers for a number of reasons, including, but not limited to, repelling robberies/attempted robberies of illicit

drugs and drug proceeds, deter such robberies, and to motivate local distributors/customers to satisfy drug debts owed.

20.   Based on my knowledge, training, experience, and conversations with other law enforcement officers, I know that people who sell or possess firearms illegally frequently take or cause to be taken photographs or other images of themselves in possession of firearms, their associates, their property, and assets with cell phones. They also frequently utilize cell phones as a way to communicate with other individuals in order to purchase or sell firearms.

## PROBABLE CAUSE

21.   The Drug Enforcement Administration (DEA) is conducting a criminal investigation of Tracy BROWN, Carolyn JARRELL and others regarding violations of Title 21 U.S.C. Section 841 – Manufacture, Distribute, or Possess with Intent to Distribute a Controlled Substance and Title 21 U.S.C. Section 846 – Conspiracy to Distribute or Possess with Intent to Distribute a Controlled Substance.

22.   In April 2023, DEA Charleston District Officers (CDO) received information from a Kanawha County Sheriff's Office (KCSO) Confidential Source (CS) regarding BROWN and JARRELL's recent involvement in trafficking bulk quantities of methamphetamine and heroin/fentanyl into West Virginia for distribution for financial gain. Prior to the information provided by the CS in April 2023, DO investigators were aware that both BROWN and JARRELL were involved in these types of criminal activities based on prior drug investigation(s) involving DEA, the Metro Drug Unit "MDENT" and the KCSO.

23.   The CS advised that BROWN was involved in multiple source cities and states where he had established sources of supply to transport methamphetamine and other narcotics into West Virginia for distribution. The CS advised that she/he had known BROWN to be

involved in the distribution of methamphetamine and other drugs for a lengthy period of time. The CS advised that she/he had frequently communicated with both BROWN and JARRELL via cell phones to address obtaining methamphetamine, and heroin/fentanyl from them.

24. The CS advised that she/he had seen BROWN in possession of large quantities of methamphetamine and other drugs, the CS described as "POUNDS." The CS advised that BROWN would traffic these narcotics into West Virginia to supply local retail dealers throughout the state.

25. More specifically, the CS advised that on or about April 2, 2023, he/she had seen BROWN in possession of several large black duffle bags in the Quincy, West Virginia area. The CS further advised that BROWN stated that he recently obtained this methamphetamine from the Detroit, Michigan area, and had coordinated its delivery into the Quincy area of West Virginia for local distributers. The CS advised that BROWN was bragging about this quantity being "fifty pounds of meth." BROWN had further stated that he already had it sold and was arranging for its delivery.

26. The CS stated, on this date (on or about April 2, 2023), BROWN further propositioned the CS to drive BROWN to his unnamed source of supply in South Carolina to pick up another "load" as BROWN referred to bulk quantities of methamphetamine and other drugs. According to the CS, BROWN's plan was to transport these narcotics back to West Virginia for distribution. The CS advised that BROWN had planned on leaving for this specific trip on "Wednesday," April 5, 2023, and return to West Virginia with the load of narcotics on that same date or the "next day." The CS advised that following this meeting BROWN had been communicating with the CS via his cellular phone concerning BROWN'S involvement in distribution of drugs.

27. Prior to the information provided by the CS in April 2023, TFO Vernon had knowledge of BROWN'S involvement in criminal activity primarily in the Quincy, West Virginia area, to include that BROWN had distributed narcotics over a number of years.

28. TFO Vernon knew that BROWN is a convicted felon in West Virginia for unlawful/malicious wounding and is currently being held in jail from a fugitive from justice warrant as a result of a criminal conviction out of Ohio. Further, BROWN has been arrested multiple times for drug-related charges.

29. TFO Vernon also had knowledge of BROWN'S involvement in providing narcotics information to law enforcement officers during previous years. BROWN'S previous "cooperation" was generally induced after investigations revealed that BROWN was involved in drug distribution activities which resulted in BROWN having knowledge of individuals who were members of drug networks that were under investigation.

30. This intelligence on BROWN and JARRELL from the CS, as well as previously known information, caused investigators to initiate this investigation of BROWN AND JARRELL in or near April 2023. This investigation included surveillance of BROWN and JARRELL to include their residences/stash locations in both the Chelyan and Elkview areas of West Virginia. It should be further noted that BROWN AND JARRELL resided together and were believed to be intimate partners during the course of the investigation.

31. During the course of this investigation, investigators further conducted a series of controlled purchases of both methamphetamine and heroin/fentanyl utilizing the CS from BROWN and JARRELL as follows:

> 1. Purchase 05-23-23 (approximately two ounces of methamphetamine from BROWN and JARRELL);

7

2. Purchase 07-13-23 (approximately 5.5 grams of fentanyl from BROWN);

3. Purchase 08-21-23 (approximately 210 grams of methamphetamine from JARRELL – approximately an ounce purchased and seven ounces "fronted");

4. Purchase 09-13-23 (approximately 2.3 grams of fentanyl from BROWN).

DEA laboratory analysis conducted subsequent to the controlled buys confirmed the type of controlled substance purchased. Law enforcement officers conducted surveillance during the aforementioned controlled drug transactions and TFO Vernon reviewed relevant audio/video recording devices utilized during the transactions. Officers were able to independently corroborate BROWN and JARRELL's involvement in the distribution of the controlled substances.

32. On or about December 13, 2023, TFO Vernon obtained a West Virginia state search warrant in Kanawha County, West Virginia, for BROWN and JARRELL'S residence located at 536 Youngs Bottom Road, Elkview, West Virginia. On this same date, CDO investigators executed this search warrant and secured the residence.

33. BROWN was found in the basement of the residence. JARRELL was not home. BROWN advised that he wanted to speak with TFO Vernon. BROWN advised that he wanted to cooperate with investigators and took TFO Vernon to BROWN and JARRELL'S master bedroom to show investigators where the "dope" was located. BROWN took TFO Vernon to a cardboard box located in their master bedroom closet. In the cardboard box, CDO investigators secured 16 individual one pound zip-lock bags that contained crystal rock like substance that was consistent with methamphetamine. The suspected methamphetamine weighed a total of approximately 16 pounds.

34. TFO Vernon further located BROWN'S Apple iPhone, as more fully described in Attachment "A," on the pool table of the basement area where BROWN was originally located. BROWN confirmed that this was his cellular phone and he provided the security code to unlock it as "102077." Brown was arrested for an unrelated fugitive of justice warrant.

35. Once at KCSO headquarters, BROWN advised that he wanted to provide a statement concerning his knowledge and involvement in this drug investigation. TFO Vernon and SA Plyer mirandized BROWN. BROWN waived his rights and signed an advice of rights waiver form before providing a statement. BROWN further advised investigators that he did not want to discuss JARRELL'S involvement in his statement.

36. In BROWN's recorded statement, he admitted to trafficking and selling methamphetamine and heroin/fentanyl at pound levels for approximately five years. BROWN provided information about his most recent out of state trips to acquire large amounts of methamphetamine and identified his current source of supply as a black male from South Carolina who he knew as "Q" (yet to be identified by investigators).

37. BROWN indicated that he initially met Q approximately four years ago. A short time after meeting Q, according to BROWN, Q began supplying him with large quantities of methamphetamine and heroin to sell locally. BROWN further stated that he stopped dealing with Q for approximately 1-2 years, but Q resumed supplying him with methamphetamine prior to December 2023.

38. In his statement, BROWN advised that the previous day he travelled with an individual he identified as Art ELKINS (ELKINS) in BROWN'S vehicle, while Q followed them in a separate vehicle, to Dayton, Ohio, to obtain the methamphetamine.

BROWN advised that once they arrived in the Dayton, Ohio area, they followed Q to a yet to be identified residence where they obtained approximately 17 pounds of methamphetamine in exchange for approximately $14,940.

39. BROWN explained that he waited outside of the residence in Dayton, Ohio, while Q went inside and returned with the methamphetamine. BROWN explained that he has collected money to purchase eight pounds of methamphetamine, but Q arranged for him to be "fronted" eight additional pounds. BROWN further said that ELKINS purchased an additional pound of methamphetamine while in Dayton, Ohio.

40. After obtaining the methamphetamine, BROWN, ELKINS and Q returned to Charleston, West Virginia. According to BROWN, ELKINS took possession of one pound of methamphetamine and BROWN returned to his and JARRELL's residence with the remaining 16 pounds of methamphetamine. BROWN further explained that Q traveled back to the Carolinas.

41. BROWN indicated that eight pounds of the methamphetamine purchased in Dayton, Ohio, was for an individual who he said he only knew as "Randy," who lived in Roane County, West Virginia. BROWN stated that he had previously delivered three pounds of methamphetamine to Randy on two prior occasions and the eight pounds were for Randy and a "buddy" of Randy's who he did not know.

42. Investigators later approached ELKINS. ELKINS confirmed this information and voluntarily surrendered the remaining pound of methamphetamine to investigators. Investigators later processed all above seized methamphetamine. A field test performed on the methamphetamine seized further confirmed the presence of methamphetamine.

43. In his statement, BROWN indicated that he had only had the iPhone for approximately three weeks because his previous phone was dropped in water and ruined.

BROWN admitted that he called and texted local drug distributors who he supplied on his cellular phone but he denied discussing drug related information via text. However, he would arrange meetings via text to talk in person. BROWN advised that Q's number was saved in his contacts on this phone as "BRO BRO." BROWN said he talked to Q on his phone as recently as earlier that morning about the methamphetamine obtained in Dayton, Ohio. BROWN also admitted that on similar drug runs, Q would provide him with addresses where drugs were waiting to be picked-up in source cities like Dayton, Ohio. BROWN stated historically that he would utilize his maps and or GPS for directions on his cellular phone to the locations identified by Q, where he would obtain quantities of drugs.

## CUSTODY OF THE APPLE IPHONE

44. The Apple iPhone described above was seized during the execution of a search warrant on December 13, 2023, as referenced in paragraphs 33 of this affidavit. After the Apple iPhone was seized, it was taken to the Drug Enforcement Administration Office in Charleston, West Virginia and placed in a secure location.

45. The Apple iPhone is currently located at the Drug Enforcement Administration Office, Charleston, West Virginia 25302.

46. In my training and experience, I know that the Apple iPhone has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Apple iPhone first came into the possession of the law enforcement officers on December 13, 2023.

## NATURE OF THE EXAMINATION

47. Based on the foregoing, and consistent with Rule 41 (e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The

11

examination may require authorities to employ techniques, including but not limited to, computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described in the warrant.

48. Because this warrant seeks permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

49. Based on my training and experience, and the facts set forth above, I believe there is probable cause that evidence of criminal violations of Title 21, U.S.C. Section 841(a)(1) – Manufacture, Distribute, or Possess with Intent to Distribute a Controlled Substance and Title 21, U.S.C. Section 846 – Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance - will be found on the Apple iPhone described more completely in Attachment "A."

WHEREFORE, I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Apple iPhone described in Attachment "A" to seek the items described in Attachment "B."

Further your affiant sayeth naught.

_____
Jonathan Vernon
Task Force Officer, Drug Enforcement Administration

Sworn to by the affiant telephonically in accordance with the procedures of Rule 4.1 of the Federal Rules of Criminal Procedure this the 16th day of January, 2024.

_____
DWANE L. TINSLEY
United States Magistrate Judge